IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                              PLAINTIFF

v.                          Crim. No. 05-20074-001

EDUARDO ARREOLA                                                       DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This case is scheduled for trial on March 6, 2006. Before me is the motion to suppress filed by defendant Eduardo Arreola ("Arreola"). (Docs. 16, 17). Arreola contends that consents to search and incriminating statements he gave to law enforcement officers were involuntary and that he was denied a timely probable cause determination after a warrantless arrest. The parties submitted hearing briefs on the latter issue. (Atts. "A" and "B").

A hearing was conducted on February 6 and 10, 2006. Witnesses were law enforcement officers Wayne Vittitow, Special Agent of the Alcohol, Tobacco, Firearms Bureau; Wayne Burnett and Scott Campbell, detectives of the Fort Smith Police Department assigned to narcotics; Paul Hursey, Drug Enforcement Agency agent assigned to Fort Smith; Brent Young, Special Agent, Immigration Custom Enforcement, stationed in Fort Smith; and Kathy Walker, records clerk of the Sebastian County Detention Center.

As an initial matter, I take up Arreola's hearsay objection to the testimony of officers that they were given consents to search by certain individuals not called as witnesses. Arreola contends this denied him his right to confront witnesses, citing *Crawford v. Washington*, 541 U.S. 36 (2004). I disagree. Hearsay evidence may be accepted at a suppression hearing if the judge is satisfied the

statements were made and no serious doubt is raised concerning truthfulness. *U.S. v. Maza*, 93 F.3d 1390, 1396 (8th Cir. 1996)(citation omitted). In my view, acceptance of the hearsay evidence was proper.

DISCUSSION

*Facts*

On October 7 and 10, 2005, searches were conducted in Fort Smith, Arkansas, of an apartment belonging to Arreola's brother Estaban Arreola ("Estaban"), the residence of the Arreola parents, and Arreola's vehicle. The searches were conducted pursuant to consents to search or a search warrant and items were found that incriminated Arreola. Also, Arreola gave verbal and written statements to officers admitting his involvement in drug activity.

I set out the hearing testimony of ATF Agent Vittitow and DEA agent Paul Hursey who seemed to have a clear recollection of events, augmented by other officer testimony I found credible. Prior to October 7, 2005, Vittitow and Hursey were aware of information concerning the criminal activity of Estaban, including that an undercover officer was purchasing drugs from Estaban and that Arreola, who had previously been deported, was believed to be the source. On October 7, 2005, Barnett advised Vittitow that Estaban had expressed an interest in exchanging firearms for drugs. After a telephone call to Estaban by the undercover officer, a meeting was set up in a hotel room where Estaban provided methamphetamine in exchange for firearms. As Estaban was headed back to his vehicle, he was arrested and the firearms retrieved. A search of Estaban's vehicle yielded methamphetamine and currency. Estaban was taken to the Sebastian County Detention Center.

Vittitow and DEA agent Paul Hursey interviewed Estaban at the jail. He was read his *Miranda* rights and signed a written form waiving his rights. (Govt's Ex. 1) Estaban reported that he lived at 1922 Brazil Street, Apartment 9, Fort Smith, and his brother Arreola was the source of the drugs. He was evasive about his brother's whereabouts but said he drove a white Pontiac Bonneville. Esteban advised he had firearms at his apartment which he shared with his fiancé Carrisa Eeds but other contraband in the apartment would belong to his brother. Officers knew from a prior check that Estaban was a convicted felon. Estaban signed a consent form allowing for a search of the Brazil Street apartment. (Govt's Ex. 4). He was not reluctant to give consent and seemed aware there was no denying his involvement in the criminal activity.

When Vittitow and Hursey arrived at the apartment complex around 4:30 or 5:00 p.m., they observed a white Pontiac Bonneville backed into a parking space and thought that Arreola could be in the apartment. Based on safety concerns, they called for backup. In response, Fort Smith police officers Scott Campbell and one or maybe two other officers arrived with ICE special agent Brent Young who was looking for Arreola because he had been deported a year earlier. The total officers present were five or possibly six.

Officers knocked on the door with pistols drawn. Fort Smith detective Campbell held a shotgun. Eeds opened the door and stepped out, identifying herself as Estaban's fiancee. She was advised that Estaban had been arrested and had given written consent to search the apartment. When asked if she "minded" if the officers conducted the search, she had no objection. She was guided to the right of the doorway by officers. Before the officers entered the apartment, Arreola came out of a bedroom in a state of undress walking in the direction of the officers. Young, who stood next to Vittitow, recognized him. Vittitow and Young commanded him to raise his hands and he was

arrested and handcuffed. A patdown search by Hursey and Young yielded money, white and green substances, a glass smoking device, and keys. All officers but Hursey, who stayed with Eeds, conducted a protective sweep of the rest of the apartment while Arreola stood against a wall. One or two children were located in the apartment. Vittitow asked Eeds about guns and stopped her as she reached under the couch. Vittitow then retrieved some guns in cases located under the couch.

Young and Hursey holstered their weapons when they approached Arreola for the patdown and to cuff him. Vittitow holstered his weapon after the apartment had been checked and he felt it was safe to do so. Firearms are drawn in any situation when officers know guns are inside a residence.

Arreola was seated in a chair. Vittitow borrowed Hursey's DEA advisory rights card and read Arreola his *Miranda* rights. Arreola verbally waived his rights and was then interviewed. He spoke "perfect" English and was resolved and cooperative. When Vittitow asked him if he lived at the apartment, he identified the bedroom he had walked out of as his room. Hursey obtained Arreola's consent to search his room (Govt. Ex. 5). Officers conducted a search of the apartment and seized guns and ammunition. Officers observed two safes in a rear bedroom and Arreola advised that one of them belonged to him. A key taken from his person opened the safe which contained three ounces of methamphetamine. Arreola admitted the drugs belonged to him. As agents were finishing the search of the apartment, they remembered that Arreola's vehicle was there and obtained his consent to search the vehicle. (Govt. Ex. 5). Loaded guns were found under the driver and passenger side of the vehicle. Marijuana and drug paraphernalia were also seized.

No force of any kind was used on Arreola during the arrest, search, and interview. Further, he did not appear to be under the influence of drugs or alcohol when he consented to the searches,

exhibiting no signs such as slurred speech or the smell of alcohol. He was compliant and cooperative, spoke freely back and forth, and responded appropriately to the questions put to him. Although he initially had reservations about consenting to the vehicle search, he "came around" when drugs were found in the bedroom. Also, he has a G.E.D. and prior experience with criminal matters.

Fort Smith detective Wayne Burnett did not participate in the search but was briefed on what occurred. His first contact with Arreola was on October 10, 2005, when he brought him to his office from the jail for an interview. Burnett uncuffed Arreola and read him his *Miranda* rights, after which Arreola signed a written waiver of his rights. (Govt's Ex. 2). Burnett wrote Arreola's written statement on the back of the form, which states in part that he returned to the United States from Mexico in February 2005, had been involved in methamphetamine sales since March/April 2005, and bought a firearm for protection. According to Burnett, Arreola speaks English very well.

Arreola told Burnett that he mainly stayed at his parents' residence located at 4613 Berkley Street in Fort Smith. He also advised he had hidden an eight-ball of methamphetamine in a punching bag in his bedroom which should still be there. He signed a consent form for the search of the residence. (Govt. Ex. 3). Burnett went there and spoke with Arreola's father through a translator. When Burnett advised the father that his son had said drugs would be in his bedroom, the father gave verbal permission to search the bedroom. Burnett found a gun but no drugs. The father refused to allow Burnett to expand the search and Burnett obtained a search warrant for the entire residence. During the subsequent search, Burnett found a glass pipe which Arreola said was his but the bag of drugs was not located. Arreola accompanied Burnett to the searches.

Regarding the matter of a timely probable cause determination, Sebastian County Detention Center records clerk Kathy Walker, referring to Arreola's booking record (Govt's Ex. 7), testified that he was arrested at 6:27 pm. on October 7, 2005, and stayed in a holding cell until his booking at 9:06 p.m. that night. He was charged with possession of methamphetamine with intent to deliver, possession of drug paraphernalia, felon in possession of firearm, simultaneous possession of drugs and firearms, maintaining premises for drug sales, and being an illegal alien. Some of the charges carried a notation of "no bond" and there was also a notation that ICE agent Brent Young advised of a nonbondable ICE hold. Also, on October 11, 2005, a verbal detainer was placed on Arreola by the U.S. Marshal's Service.

Walker explained that after October 7, 2005, the next scheduled court day for arraignments was the following Wednesday, five days later. However, arresting officers routinely fill out probable cause affidavits at the jail and the affidavits are then submitted daily to the judges by the prosecutors.

Fort Smith police officer Scott Campbell completed an affidavit regarding Arreola on the day of arrest, October 7, 2005. (Govt's Ex. 8 ). However, for some reason the form was never signed by a judge. Detective Wayne Burnett testified that when he interviewed Arreola on October 10, 2005, he knew Campbell had submitted the affidavit and assumed a judge had already made a probable cause determination. Burnett said he wanted to interview Arreola prior to arraignment because, after appointment of counsel, it might be days or weeks before an attorney visited with his client and got back to Campbell about an interview. Campbell said that time was of the essence in interviewing Arreola concerning the state charges.

On October 12, 2005, a criminal complaint was filed in this court charging Arreola with possession with intent to distribute more than 50 grams of methamphetamine, illegal reentry by a

felon previously deported, and illegal alien in possession of a firearm. An arrest warrant issued and was executed the same date. At the initial appearance conducted the next day, Arreola waived detention and a preliminary hearing. Burnett offered at the hearing that he does not know how the decision to file federal charges was made and he works cases the same whether they result in state or federal charges.

*Searches/Statements*

"A warrantless search does not violate the Fourth Amendment if knowing and voluntary consent was given." *United States v. Almendares*, 397 F.3d 653, 660 (8th Cir. 2005)(citations omitted). "The government bears the burden of proving voluntary consent by a preponderance of the evidence and must show that on the totality of the circumstances the officer reasonably believed that the search was consensual." *Id.* In deciding the reasonableness of the officer's belief, we consider the nature of the encounter and the characteristics of the consenting party, including age, intelligence, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects. *Id.*, at 660-661 (citing *United States v. Chaidez*, 906 F.2d 377, 380-81 (8th Cir. 1990)).

Here, the government has shown that the searches conducted on October 7, 2005, of the apartment on Brazil Street and Arreola's vehicle were consensual. No evidence suggests that officers used coercive means to obtain the written consent of Esteban and the verbal approval of Eeds to search the Brazil Street apartment. Rather, Esteban quickly decided to cooperate and provide information and Eeds went along when advised of Esteban's consent to search. Arreola's consent to a search of his bedroom at the Brazil Street apartment and his vehicle was also voluntary. Officers provided credible evidence that they did not use coercion or force in obtaining the consent. The

officers' display of weapons alone cannot be considered a coercive factor, particularly when Arreola owned several guns, was a drug dealer, and was a convicted felon previously deported from the country. Also, Arreola understands English, has a G.E.D., and is experienced in criminal matters. Further, he was advised of his *Miranda* rights prior to giving consent and exhibited no signs of intoxication.

Arreola's consent of October 10, 2005, to search his bedroom at the Berkley Street residence, was voluntary. Arreola gave the address as his main residence and he obviously stayed there some of the time and left items there. An adult co-occupant of a residence may consent to a search. *United States v. Jones*, 193 F.3d 948, 950 (8th Cir. 1999). The consent came three days after the initial arrest during an interview with Detective Burnett when Arreola gave a full confession and expressed a willingness to cooperate. Arreola's father, who owned the residence, concurred with Arreola's consent to have the bedroom searched and a warrant was obtained to search the remainder of the home.

Regarding Arreola's confessions, this is not one of those "rare cases" in which a defendant's self-incriminating statements were "compelled" by threats, violence, or direct or implied promises despite the fact he received *Miranda* warnings. *See U.S. v. Astello*, 241 F.3d 965, 966-67 (8th Cir. 2001)(quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 (1984)). Here, Arreola was familiar with criminal proceedings, having previously been found guilty of a felony and deported, and there is no showing of coercive conduct by police officers. *See Davis v. State of N.C.*, 384 U.S. 737, 742 (1966) (confession involuntary under circumstances showing the defendant's will was overborne as a result of overbearing by police authorities); 18 U.S.C. § 3501 (setting out factors to consider for admissibility of confessions).

*Probable Cause Determination*

Following a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause for the arrest to justify extended pretrial detention. *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991); *Gerstein v. Pugh*, 420 U.S. 103 (1975). Judicial determinations of probable cause that occur within 48 hours of arrest are presumed to meet the promptness requirement unless the arrestee can prove the determination was delayed unreasonably. *Riverside*, 500 U.S. at 56. "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested person, or delay for delay's sake." *Id. See also U.S. v. Davis*, 174 F.3d 941 (8th Cir. 1999) (detention under three hours unreasonable where probable cause determination delayed by the officers' attempts to investigate arrestee's role in additional crimes). After the 48-hour period, the burden shifts to the government to show "a bona fide emergency or other extraordinary circumstances." Riverside, 500 U.S. at 57.

Here, although arresting officer Campbell completed and signed his probable cause affidavit the day of arrest, it was not signed by a state judge per the usual policy. No explanation for this oversight was offered at the hearing. Thus, the probable cause determination on the new charges was not made until five days after arrest when the federal criminal complaint was presented to a judge who issued an arrest warrant. Although Arreola was held on an INS detainer, he was also held on new criminal charges without the benefit of a timely probable cause determination which appears to contravene *Gerstein* and *McLaughlin*.

Assuming a *Gerstein/McLaughlin* violation, this does not warrant suppression of the October 10, 2005, confession and consent to search. Arreola, who is familiar with the criminal justice

system, gave a voluntary confession on October 7, 2005, after waiving *Miranda* rights prior to placement in the jail and he also gave voluntary consents to search. On October 10, 2005, prior to giving the second statement, he was again advised of and waived his *Miranda* rights. There is no suggestion that officers used coercive tactics in obtaining the confessions or that the delay was intentionally caused by an arresting officer to obtain an advantage over Arreola. Rather, there was a policy in force which should have ensured a timely probable cause determination and Burnett assumed when he interviewed Arreola that the policy had been followed. In sum, the delay was not for the purpose of obtaining a confession, had no coercive effect on the confession, and there is no causal connection between the delay of the probable cause determination and the making of the confession. As such, suppression should be denied. *See U. S. v. Mullin*, 178 F.3d 334, 342 (5th Cir.), *cert. denied*, 528 U.S. 990 (1999). *See Anderson v. Calderon*, 232 F.3d 1053, 1070-77 (9th Cir. 2000), *cert. denied*, 534 U.S. 1036 (2001); *Morrison v. Apfel*, 146 F.3d 625 (8th Cir. 1998)(suppression of clearly voluntary statement error).

CONCLUSION

Based on the above, I recommend that the motion to suppress filed by Eduardo Arreola be denied and dismissed. **The parties have seven days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.**

DATED this 14th day of February 2006.

/s/Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE